Filed 12/17/19 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| O&C CREDITORS GROUP, LLC, et al.,<br><br>    Cross-complainants and Appellants,<br><br>v.<br><br>STEPHENS & STEPHENS XII, LLC, et al.,<br><br>    Cross-defendants and Respondents. | A151789<br><br>(San Francisco City & County Super. Ct. No. CGC-17-556475) |
| STEPHENS & STEPHENS XII, LLC, et al.,<br><br>    Plaintiffs, Cross-defendants and Appellants,<br><br>v.<br><br>O&C CREDITORS GROUP, LLC, et al.,<br><br>    Defendants, Cross-complainants and Respondents. | A152002<br><br>(San Francisco City & County Super. Ct. No. CGC-17-556475) |
| O&C CREDITORS GROUP, LLC, et al.,<br><br>    Cross-complainants and Appellants,<br><br>v.<br><br>AKIN GUMP STRAUSS HAUER & FELD, LLP, et al.,<br><br>    Cross-defendants and Respondents. | A152762<br><br>(San Francisco City & County Super. Ct. No. CGC-17-556475)<br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A and II.D.

1

THE COURT:

It is ordered that the opinion herein filed on November 25, 2019, be modified as follows:

1.      On page 3, heading I.B.a is changed to:

> ### a. O'Reilly is Defeated at Trial, Allegedly Abandons the Case, and is Forced into Bankruptcy

2.      On page 3, the fourth sentence of the first paragraph of section I.B.a is changed from "Thereafter, O'Reilly withdrew from the case." to:

3.

> "Thereafter, O'Reilly no longer represented Stephens in the case."

4.      On page 3, the first sentence of the first paragraph of section I.C is changed from "After the O'Reilly firm's withdrawal, the Stephens entities retained Nina Shapirshteyn, a former O'Reilly associate, to represent them in the insurance coverage lawsuit." to:

> "After the O'Reilly firm ceased representing the Stephens entities, they retained Nina Shapirshteyn, a former O'Reilly associate, to represent them in the insurance coverage lawsuit."

There is no change in the judgment.

Dated:_____                    _____, Acting P.J.

*O&C Creditors Group, LLC et al. v. Stephens & Stephens XII, LLC et al. (A151789); Stephens & Stephens XII, LLC et al. v. O&C Creditors Group, LLC et al. (A152002); O&C Creditors Group, LLC et al. v. Akin gump Straus Hauer & Feld, LLP (A152762*

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| O&C CREDITORS GROUP, LLC, et al.,<br><br>    Cross-complainants and<br>    Appellants,<br><br>v.<br><br>STEPHENS & STEPHENS XII, LLC, et al.,<br><br>    Cross-defendants and Respondents. | A151789<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-17-556475) |
| STEPHENS & STEPHENS XII, LLC, et al.,<br><br>    Plaintiffs, Cross-defendants and<br>    Appellants,<br><br>v.<br><br>O&C CREDITORS GROUP, LLC, et al.,<br><br>    Defendants, Cross-complainants<br>    and Respondents. | A152002<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-17-556475) |
| O&C CREDITORS GROUP, LLC, et al.,<br><br>    Cross-complainants and<br>    Appellants,<br><br>v.<br><br>AKIN GUMP STRAUSS HAUER &<br>FELD, LLP, et al.,<br><br>    Cross-defendants and Respondents. | A152762<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-17-556475) |

---

    [*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A and II.D.

1

These consolidated appeals arise from an insurance coverage dispute that resulted in a $5.8 million settlement in favor of the insured. At the center of the dispute is the enforceability of a lien for attorney's fees filed by the insured's former attorney, who is now deceased. Prior to his death, the attorney for the insured became subject to an involuntary bankruptcy. The largest creditor of the bankruptcy estate, also an attorney, purchased the attorney fee claim and received all of the debtor-attorney's client files, including the insured's file. After the insured sought declaratory relief, the attorney-creditor assigned his interest in the fee claim to a newly formed corporate entity, of which the attorney-creditor is the sole member.

In these consolidated appeals and cross-appeals, the parties dispute whether the trial court erred in (1) denying the insured's motion to disqualify the attorney-creditor from representing the corporate entity, (2) granting a protective discovery order regarding the insured's client file, and (3) granting an anti-SLAPP special motion to strike in favor of the insurer and awarding attorney fees to the insurer as the prevailing party. Finding no such errors, we affirm.

## I.    BACKGROUND

### A. *Insurance Coverage Dispute*

Fireman's Fund Insurance Company (Fireman's Fund) issued an insurance policy covering property damage at an industrial warehouse owned by Stephens & Stephens XII, LLC and its affiliates[1] (collectively, Stephens or the Stephens entities). (*Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.* (2014) 231 Cal.App.4th 1131, 1134–1135 (*Stephens XII*).) Three days after the policy became effective, Stephens discovered that burglars stripped the property of all electrical and conductive material. (*Ibid.*) Stephens filed a claim with Fireman's Fund for coverage. The claim was not resolved, prompting Stephens to file an insurance coverage suit. (*Ibid.*)

---

[1] The related affiliates are: Stephens & Stephens XII, LLC; D.R. Stephens & Company, LLC; Don Stephens; and Lane Stephens.

## B. Stephens Retains Counsel

Stephens retained attorney Terry O'Reilly and his firm O'Reilly & Collins (O'Reilly) to represent them in the lawsuit with Fireman's Fund. The two-page retainer agreement provided that O'Reilly would receive 40 percent of any recovery obtained after trial, granted a first lien to assure payment of fees, and provided: "In the event that there is no money recovered, attorneys shall recover nothing for their services." O'Reilly, however, did not provide Stephens with a copy of the retainer agreement signed by counsel.

### b. O'Reilly is Defeated at Trial, Abandons the Case, and is Forced into Bankruptcy

The insurance coverage lawsuit proceeded to trial. The law firm of Akin Gump Strauss Hauer & Feld, LLP (Akin Gump) represented Fireman's Fund at all relevant times. The jury rendered a verdict in favor of Stephens, but the trial court entered judgment notwithstanding the verdict (JNOV), awarding Stephens nothing. (*Stephens XII, supra,* 231 Cal.App.4th at pp. 1139–1142.) Thereafter, O'Reilly withdrew from the case. On October 25, 2012, Michael Danko, an attorney and former O'Reilly partner, filed a Chapter 7 (11 U.S.C. § 701 et seq.) involuntary bankruptcy petition against O'Reilly. Danko was the largest creditor, with a claim of more than $6 million against the bankruptcy estate.

On November 6, 2012, Credit Management Associates (CMA)—an entity claiming to be the assignee of O'Reilly—filed a notice of attorney lien in the trial court docket. CMA asserted that it had a "lien on any recovery in the [insurance coverage lawsuit]." CMA apparently used the wrong zip code on the service copy for Akin Gump, however, and the attorney lien was never received.

## C. Appeal and Settlement

After the O'Reilly firm's withdrawal, the Stephens entities retained Nina Shapirshteyn, a former O'Reilly associate, to represent them in the insurance coverage lawsuit. In October 2012, Shapirshteyn filed an appeal of the adverse judgment. In November 2014, our colleagues in Division One of this court reversed the JNOV in favor

3

of Fireman's Fund. (*Stephens XII, supra,* 231 Cal.App.4th at pp. 1146–1148, 1151.) However, the court did not reinstate the jury verdict. Instead, the court interpreted the jury verdict as a conditional verdict, entitling the Stephens entities to compensation only if they actually made repairs to the insured warehouse. (*Id.* at p.1143.) Based on that interpretation, this court remanded the case for further proceedings. (*Id.* at p. 1151.)

In December 2015, the Stephens entities and Fireman's Fund settled their dispute for $5.8 million.[2] The written settlement agreement expressly determined the allocation of the settlement proceeds—specifically, that the proceeds would be paid solely to the Stephens entities and Shapirshteyn. The Stephens entities represented during the negotiations and in the agreement that no one else was entitled to any portion of the settlement. The Stephens entities further agreed to indemnify and hold Fireman's Fund harmless if anyone claimed that they were entitled to any of the proceeds of the settlement.

### D. Stephens and the Bankruptcy Trustee Agree to Hold the Proceeds in Escrow

In February 2016, Shapirshteyn provided a copy of the settlement agreement to the trustee in the O'Reilly bankruptcy. The trustee claimed that the estate was entitled to 40 percent of the settlement, while Stephens contended that nothing was owed to the estate. Shapirshteyn stated that she would deposit 40 percent of the settlement funds with the bankruptcy court and file an interpleader complaint. However, the trustee instead directed Shapirshteyn to hold the 40 percent in her client trust account until the estate's claim was resolved. She agreed to do so.[3]

### E. Danko Obtains Stephens's Litigation File From the Trustee

In June 2016, Stephens requested the trustee to return "all client papers and property, including but not limited to all emails and billing records," to Stephens under

---

[2] Terry O'Reilly died in October 2015.

[3] The proceeds ($2.3 million) remain in Shapirshteyn's account to this day.

rule 3-700(D) of the Rules of Professional Conduct[4] (Rule 3-700(D)), which then required the return of all client materials and property upon the termination of representation. Despite several follow-up requests, the trustee did not return the file to Stephens or acknowledge that he possessed it.

In August 2016, the trustee gave Danko full access to O'Reilly's electronic servers and physical documents, including Stephens's confidential client file, without notifying Stephens. Danko then used "specific search criteria" to identify "correspondence related to the claim against Stephens and the underlying Fireman's Fund litigation," including "emails by O'Reilly [] to outside counsel, internal emails discussing the case, emails with experts and consultants, as well as emails from the firm to and from Stephens."[5] Danko "immediately set about reviewing" those documents because they were "the only source of evidence available" to him regarding the value of the estate's claim.

## F. Danko Purchases the Attorney Fee Claim

In August 2016, Stephens and the trustee reached an $800,000 settlement on the O'Reilly estate's attorney fee claim. When the trustee submitted the settlement for bankruptcy court approval, he explained that the settlement was beneficial because there was significant uncertainty as to whether the estate could prevail on its claim for fees.

In October 2016, Danko objected to settlement and offered to purchase the claim for $850,000. In November 2016, counsel for Stephens notified counsel for Danko and the trustee that Stephens would void the retainer agreement as soon as the bankruptcy

---

[4] At the relevant time, Rule 3-700(D) required an attorney to turn over to a former client all " 'client papers and property.' " (*Eddy v. Fields* (2004) 121 Cal.App.4th 1543, 1548, citing Rules Prof. Conduct, rule 3-700(D).) Rule 3-700(D) has since been revised and, as modified, appears in rule 1.16, subdivision (e), effective November 1, 2018. (Cal. Rules Prof. Conduct, rule 1.16.)

[5] Danko is not and has never been attorney for the Stephens entities. Danko's and O'Reilly's business relationship terminated prior to the Stephens entities' retention of O'Reilly Collins as their attorneys in 2010. (See, e.g., *Danko v. O'Reilly* (2014) 232 Cal.App.4th 732, 736 ["From 1995 to 2009, plaintiff Michael Danko practiced law with defendant Terry O'Reilly, primarily in the firm of O'Reilly & Collins."]).

stay was no longer applicable "and thereby void any attorney lien on settlement proceeds from the Fireman's Fund litigation." On December 2, 2016, Danko purchased the bankruptcy estate's interest in the Fireman's Fund settlement proceeds on an "as-is" basis.

## G. State Court Litigation Commences

On December 22, 2016, based on O'Reilly's failure to sign the retainer agreement, Stephens sent Danko's counsel a letter voiding the retainer agreement in its entirety, including that portion of the agreement that provided for an attorney lien. Stephens then filed a declaratory relief action against Danko to determine whether Stephens owed money to Danko as the assignee of O'Reilly's fee claim.

In February 2017, Danko formed a limited liability company, O&C Creditors Group, LLC (O&C Creditors), with himself as the sole member, manager, organizer, and agent for service of process. Danko purported to assign his claims against Stephens to the limited liability company. Stephens then filed a first amended complaint naming both Danko and O&C Creditors as defendants in the declaratory relief action. On behalf of O&C Creditors, Danko filed a cross-complaint for $2.32 million against Stephens (for unpaid legal fees) and against Akin Gump and Fireman's Fund (for settling the insurance coverage lawsuit in derogation of the alleged attorney lien).

In their answer to the cross-complaint, the Stephens entities raised an affirmative defense for offset based on their damages from O'Reilly's alleged malpractice in the Fireman's Fund litigation. That defense was based solely on O'Reilly's refusal in open court to introduce evidence of a certain category of damages when given the opportunity to do so by the trial court.

6

## H. Discovery Begins

In early March 2017, Stephens served subpoenas on the trustee and his attorneys seeking various documents, including the trustee's communications with Danko. The subpoenas did not seek the production of Stephens's client file. Indeed, at that time, Stephens believed that the trustee did not have the client file based on the trustee's failure to return that file to Stephens.

In late March 2017, pursuant to a request for production, Danko produced roughly 170,000 pages of Stephens's privileged and confidential documents, including Stephens's privileged communications with O'Reilly. Prior to this production, neither Stephens nor their attorneys knew that Danko had any of Stephens's privileged and confidential documents.

Danko later responded to written discovery based on his review of Stephens's client file. For example, Danko denied a request for admission that O'Reilly Collins failed to sign the retainer agreement because, according to Danko, "O'Reilly Collins sent a signed letter, confirming the terms of the retainer agreement . . . to Stephens."

In April 2017, the trustee served objections to the subpoenas, including an objection based on attorney-client privilege, and the trustee produced less than 200 unprivileged documents. Eleven days later, in response to inquiries regarding the location of the client file, the trustee informed Stephens that he had produced Stephens's client file to the deposition officer. Stephens demanded that the trustee stop the production of privileged and confidential documents and, if the production had already occurred, Stephens demanded that the deposition officer destroy the production or return it to the trustee unopened.

## I. Trial Court Issues Temporary Restraining Order

Upon discovering that Danko possessed their privileged communications and confidential client file, the Stephens entities immediately demanded that Danko return them and, when he refused, the Stephens entities obtained a temporary restraining order preventing Danko from "reviewing, using, or disclosing the documents that Danko received from the trustee."

7

After the trial court issued the temporary restraining order, the trustee filed a "motion to clarify" in the bankruptcy court, seeking an order that the trustee "should transfer any and all documents that he has or his counsel have regarding Stephens to counsel for Mr. Danko." In this motion, the trustee admitted that "most if not all of these documents were already shared with Danko when the trustee was adverse to Stephens." Danko joined the motion and argued that the bankruptcy court should grant the requested relief because the trial court was considering the same or similar issues.

In May 2017, the bankruptcy court issued a tentative ruling denying the motion, concluding that the "trustee did not purport to sell [Danko] the attorney-client files that belong to and should be returned to [Stephens] under Cal. Rule of Prof. Conduct 3-700(D). *Those files could not be transferred to (Danko) absent consent of (Stephens). Nor could the trustee sell Danko the right to control the attorney-client privilege.*" (Italics added.) Two days later, the bankruptcy court denied the motion "for the reasons stated on the record."

## J. Trial Court Orders Danko to Return Stephens's Client File and Issues Discovery Order

In late May 2017, the trial court issued a discovery order preventing Danko's review and use of the client file and ordering Danko to return the client file to Stephens. In so ruling, the trial court explained that "there is no bankruptcy rule that authorized the bankruptcy trustee to give access to the records at issue in this motion to [Danko]" and, "except for documents reflecting communications with the trustee, the purchase of the fee claim against [Stephens] does not give . . . [Danko] . . . the right to retain any of the documents that [he] received from the bankruptcy trustee." The trial court further determined that the "right, if any, of [Danko] to receive and use some or all of" those documents "must be made on a document by document determination . . . and that, in the first instance, that determination should be made by [Stephens]." The trial court ordered Danko "to bates stamp all originals and all copies of all documents they received from the bankruptcy trustee in the O'Reilly [] bankruptcy case and then produce, without keeping any originals or copies for themselves or for anyone working in concert with

8

them, all those documents to [Stephens] with verifications stating their full compliance with this order."

### K. Trial Court Denies Stephens's Motion to Disqualify Danko Meredith

In June 2017, Stephens filed a motion to disqualify Danko Meredith from representing O&C Creditors. Stephens argued that Danko Meredith violated the rules regarding inadvertent discovery by obtaining, reviewing, and using Stephens's privileged and confidential documents and that disqualification is warranted because there is a reasonable probability that Danko Meredith has privileged material it will likely use against Stephens. It further contended that disqualification is also necessary to maintain public trust and confidence in the integrity of the adjudicatory process.

In opposing the motion, Danko conceded that Danko Meredith had obtained, reviewed, and used Stephens's privileged communications and confidential client file but argued that Stephens had waived the attorney-client privilege by filing the declaratory relief action. Danko also argued there was no inadvertent disclosure or prejudice because he was entitled to review Stephens's client file to the same extent as the trustee and O'Reilly.

In July 2017, the trial court issued an order denying the motion to disqualify. The trial court held: "The Stephens entities have not identified any specific information that they assert the Danko Meredith firm impermissibly obtained that will be used to the disadvantage of the Stephens entities. In reaching this conclusion, the court has not made any explicit or implicit ruling on any issue of privilege or waiver, including the applicability or scope of Evidence Code 958 to any of the information that the Danko Meredith firm received from the bankruptcy trustee. The fact that the Danko Meredith firm impermissibly received the 'client file' from the trustee is not, without more, sufficient to warrant its disqualification."

### L. The Trial Court Grants the Anti-SLAPP Motion and Awards Attorney Fees

In response to O&C Creditors' cross-complaint, Fireman's Fund and Akin Gump filed a special motion to strike under California's anti-SLAPP statute (Code Civ. Proc., § 425.16). The motion to strike targeted two causes of action in the cross-complaint: a

9

claim for breach of trust against Fireman's Fund based on the theory that Fireman's Fund owed a fiduciary duty to O'Reilly and/or the bankruptcy estate and "breached that trust" by both failing to advise the bankruptcy court of the Stephens-Fireman's Fund settlement and "secretly disbursing" the proceeds of the settlement (sixth cause of action); and a claim for interference with prospective business advantage against both Fireman's Fund and Akin Gump based on the same acts (seventh cause of action).

After extensive briefing and argument, the trial court granted the motion. The trial court ruled that the settlement of civil lawsuits is petitioning activity protected by the anti-SLAPP statute. The court then found that O&C Creditors' claims lacked merit. The court reasoned that, because attorney liens arise only by contract, a valid attorney lien can exist only if there is an enforceable contract. And, because O'Reilly did not sign its own engagement letter, Stephens were able to and did void the contract, thereby voiding the attorney lien. As all of O&C Creditors' claims arose from a void lien, the court struck them from the cross-complaint. The court awarded attorney's fees to Fireman's Fund as the prevailing party on the special motion to strike.

### M. Appeals Follow

The Stephens entities appeal from the order denying the motion to disqualify O&C Creditors' attorneys. Danko appeals from the protective discovery order granted in the Stephens entities' favor. Danko also appeals from the order granting the special motion to strike and the related order granting attorney fees.

## II. DISCUSSION

### A. The Trial Court Did Not Err in Denying Stephens's Motion to Disqualify

#### 1. Applicable Law

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.] Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to

10

maintain ethical standards of professional responsibility.  [Citation.]  The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar.  The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems*, *Inc.* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil*).)  "Deciding whether disqualification is the appropriate remedy thus involves a delicate balancing of competing policy considerations."  (*City of San Diego v. Superior Court* (2018) 30 Cal.App.5th 457, 470 (*City of San Diego*).)

Attorney disqualification cases typically fall into one of two categories:  (1) successive representation by an attorney of a former and of a current client (e.g., *SpeeDee Oil, supra,* 20 Cal.4th at p. 1146; see *Lynn v. George* (2017) 15 Cal.App.5th 630, 636–638); and (2) inadvertent disclosure to opposing counsel of privileged or confidential communications (*McDermott Will & Emory LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1119–1120 (*McDermott*)).

This is not a successive representation case.  Thus, we look to the principles governing disqualification for inadvertent disclosure to guide our analysis.  *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644 (*State Fund*) is the seminal case regarding an attorney's obligations in cases of inadvertent disclosure.  "[T]he *State Fund* rule requires the attorney to review the documents no more than necessary to determine whether they are privileged, notify the privilege holder the attorney has the documents that appear to be privileged, and refrain from using the documents until the parties resolve or the court resolves any dispute about their privileged nature."  (*McDermott, supra,* 10 Cal.App.5th at p. 1092.)

"In the context of inadvertently disclosed, attorney-client communications, ' " ' "[m]ere exposure" ' to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification." '  [Citations.]  ' "Protecting the integrity of judicial proceedings does not require so draconian a rule [because it] would nullify a party's right to representation by chosen counsel any time inadvertence or devious design

11

put an adversary's confidences in an attorney's mailbox." ' [Citations.] Nonetheless, ' " 'in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in [accordance with his or her *State Fund* duties], assuming other factors compel disqualification.' " ' " (*McDermott, supra,* 10 Cal.App.5th at p. 1120.)

" '[D]isqualification is proper as a prophylactic measure to prevent future prejudice to the opposing party from information the attorney should not have possessed'; an affirmative showing of existing injury from the misuse of privileged information is not required. [Citation.] A trial court, however, may not order disqualification ' "simply to punish the dereliction that will likely have no substantial continuing effect on judicial proceedings." ' " (*McDermott, supra,* 10 Cal.App.5th at p. 1120.)

The critical question posed by the "substantial continuing effect" inquiry is " 'whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court. Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation. Though such information cannot be unlearned, and the lawyer who obtained it cannot be prevented from giving it to others, disqualification still serves the useful purpose of eliminating from the case the attorney who could most effectively exploit the unfair advantage.' " (*McDermott, supra,* 10 Cal.App.5th at p. 1120, quoting *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 309.)

"A trial court's ruling on a disqualification motion is reviewed under the deferential abuse of discretion standard. [Citations.] 'In exercising its discretion, the trial court must make a reasoned judgment that complies with applicable legal principles and policies.' [Citations.] 'The order is subject to reversal only when there is no reasonable basis for the trial court's decision.' " (*Clark v. Superior Court* (2004) 196 Cal.App.4th 37, 46 (*Clark*).)

"Even under [the abuse of discretion] standard, there is still a substantial evidence component. We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion." (*Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 544 (*Tire Distributors*); see *Clark*, *supra*, 196 Cal.App.4th at p. 46.) "The trial court's order is ' "presumed correct; all intendments and presumptions are indulged to support [it]; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive." ' " (*Clark*, at pp. 46–47.)

2. **Because There is No Reasonable Likelihood That Any Misconduct in This Case Will Give O&C Creditors an Unfair Advantage, Disqualification of Danko Meredith Was Not Required**

Initially, the Stephens entities contend the standard of review is de novo because there are no material disputed facts. Not exactly. While it is undisputed that the trustee gave the Stephens entities' client file to Danko Meredith, the nature of the information contained therein and the subsequent use of that information are very much in dispute. Accordingly, we review the trial court's disqualification decision for abuse of discretion, deferring to the court's factual findings so long as they are supported by substantial evidence. (*Tire Distributors, supra,* 132 Cal.App.4th at p. 544.) With the appropriate standard of review in mind, we turn to the merits.

The Stephens entities contend that the trial court erred in refusing to disqualify Danko Meredith based on the violation of its *State Fund* duties. However, disqualification requires more than mere misconduct. (See *McDermott, supra,* 10 Cal.App.5th at p. 1120.) In order to warrant disqualification, there must be a " 'genuine likelihood' " that the attorneys' status or misconduct " 'will affect the outcome of the proceedings before the court.' " (*Ibid.*) Here, in denying the motion, the trial court explained, the mere fact that "the Danko Meredith firm impermissibly received the 'client file' from the trustee is not, *without more*, sufficient to warrant its disqualification." (Italics added.) We agree with this assessment.

13

The Stephens entities insist that the trial court erred because "there is much more here," but even assuming that Danko Meredith impermissibly reviewed privileged information, the record belies any claim of prejudice. This is because even if the Danko Meredith law firm were disqualified, its client—O&C Creditors—would remain as a party in the litigation, as would Danko himself. As indicated, Danko is a named partner in the law firm and is also the principal of O&C Creditors. Danko's dual role as attorney-litigant creates a complex overlapping of relationships that ultimately militates against disqualification.

To put it simply, even if there were grounds to disqualify Danko Meredith, there is no authority to prevent Danko himself, as the acting principal of O&C Creditors, from hiring new counsel to represent O&C Creditors (the entity that effectively stands in the shoes of O'Reilly vis à vis the attorney fee claim). The Stephens entities do not contend otherwise; indeed, in arguing that Danko Meredith should be disqualified, Stephens assert that the "paramount concern" should be protection of their client files, not "whether Danko will have to hire a new attorney." And again, Danko himself would remain a defendant in the Stephens entities' declaratory relief action even if Danko Meredith were disqualified from representing O&C Creditors. Accordingly, as the trial court noted, disqualification along the lines the Stephens entities seek would be akin to granting a "motion to win" that would prevent Danko and O&C Creditors "from even defending this case."

As explained above, "[w]e do not disqualify a lawyer from representing a client to punish the lawyer's mistakes or even bad behavior. [Citations.] . . . Rather, disqualification of counsel is a prophylactic remedy designed to mitigate the unfair advantage a party might otherwise obtain if the lawyer were allowed to continue representing the client." (*City of San Diego, supra,* 30 Cal.App.5th at pp. 470–471.) On this record, and in light of the measures fashioned by the trial court to protect the Stephens entities' privileged materials (discussed further below), there is no evidence to suggest an unfair advantage would inure to O&C Creditors' benefit if Danko Meredith, as opposed to another law firm, represented O&C Creditors.

In sum, there is no genuine likelihood that O&C Creditors' continued representation by Danko Meredith will affect the outcome of the declaratory relief action in the trial court.

## B. *The Court Did Not Err in Granting the Discovery Motion*

### 1. **Appealability and Standard of Review**

Initially, Danko argues that the discovery order is a "preliminary, mandatory injunction" subject to appeal under Code of Civil Procedure section 904.1, subdivision (a)(6). The record refutes this claim. The trial court noted that although the request was "labeled a preliminary injunction motion," it was, "in substance, a discovery motion" that did not require analysis of the preliminary injunction factors or the posting of a bond. Like the trial court, we do not find labels to be dispositive and instead look at the substance of the motion, which is rooted in the Stephens entities' desire to prevent any further use of their privileged information.

Both the civil rules of discovery and case law provide authority to grant a protective order for misuse of the discovery process. (See Code Civ. Proc., § 2031.060, subd. (b); *State Fund, supra,* 70 Cal.App.4th at pp. 656–657.) As we deem the challenged order to be a protective discovery order rather than a preliminary injunction, we need not analyze whether the Stephens entities have established the prerequisites for injunctive relief.

Discovery orders are not directly appealable, and even writ review of such orders is limited; instead, they are generally challenged by appeal from the final judgment. (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1060; *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1060–1061, disapproved on another ground in *Williams v. Superior Court* (2017) 3 Cal.5th 531, 555–556 & fn. 8.) Where, as here, the challenger seeks relief from an order that could undermine a privilege, writ relief is appropriate. (See *Los Angeles Gay & Lesbian Center v. Superior Court* (2011) 194 Cal.App.4th 288, 299–300; *Raytheon Co. v. Superior Court* (1989) 208 Cal.App.3d 683, 686.) Thus, we exercise our discretion to treat Danko's challenge to the discovery order as a writ petition. (See *Green v. GTE California, Inc.* (1994) 29 Cal.App.4th 407, 408.)

15

" 'Management of discovery lies within the sound discretion of the trial court. Consequently, appellate review of discovery rulings is governed by the abuse of discretion standard. [Citation.] Where there is a basis for the trial court's ruling and the evidence supports it, a reviewing court will not substitute its opinion for that of the trial court. [Citation.]' [Citation.] The trial court's determination will be set aside only when it has been established that there was no legal justification for the order granting or denying the discovery in question." (*Save Open Space Santa Monica Mountains v. Superior Court* (2000) 84 Cal.App.4th 235, 245–246, disapproved on another ground in *Williams v. Superior Court, supra,* 3 Cal.5th at p. 557, fn. 8.)

## 2. Legal Principles

The attorney-client privilege prevents disclosure of confidential communications between a client and attorney. (Evid. Code, § 950 et seq.) The term " 'confidential communication' " includes "information transmitted between a client and his . . . lawyer in the course of that relationship and in confidence." (Evid. Code, § 952.) If a "confidential communication between client and lawyer" exists, the client has a privilege protecting disclosure (Evid. Code, § 954), and the attorney has an obligation to refuse disclosure unless otherwise instructed by the client (Evid. Code, § 955). While attorney-client communications are presumed to be confidential (Evid. Code, § 917), the party claiming the attorney-client privilege as a bar to disclosure has the burden of showing that the communication sought to be suppressed falls within the parameters of the privilege. (*Alpha Beta Co. v. Superior Court* (1984) 157 Cal.App.3d 818, 825.)

The attorney-client privilege is a legislative creation that courts have no power to limit unless expressly provided by statute. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 739 (*Costco*).) Evidence Code sections 956 through 962 describe eight exceptions to the attorney-client privilege. (*Edwards Wildman Palmer LLP v. Superior Court* (2014) 231 Cal.App.4th 1214, 1227.) Where none of these exceptions applies, " '[t]he privilege is absolute and disclosure may not be ordered, without regard to relevance, necessity or any particular circumstances peculiar to the case.' " (*Costco,* at p. 732.)

16

Relevant to this appeal is whether the exception set forth in Evidence Code section 958 applies.  Pursuant to that exception, "[t]here is no privilege . . . as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship."  (Evid. Code, § 958.)  However, privileged communications do not become discoverable merely because they are related to issues raised in the litigation.  (*Schlumberger Limited v. Superior Court* (1981) 115 Cal.App.3d 386, 393.)  Rather, the privileged communications must be directly at issue.  (*Ibid.*)  In other words, it is " 'not merely the initiation of the lawsuit but rather the manner of its prosecution that constitutes the waiver.' "  (*Ibid.*)  If tendering the issue of damages in an action automatically waived the privilege, the exception would swallow the rule and Evidence Code section 954 would be meaningless.  (*Ibid.*)

### 3.  Waiver

Danko first contends that the Stephens entities waived the attorney-client privilege by failing to object to the sale of the fee claim and by subpoenaing documents from the bankruptcy trustee.  The trial court rejected these arguments in granting the Stephens entities' motion, and so do we.

The attorney-client privilege is retained, even without express assertion thereof, until the holder voluntarily discloses a substantial part of the privileged communication or otherwise manifests his or her consent to the disclosure by others.  (See Evid. Code, § 912; *McDermott, supra,* 10 Cal.App.5th at p. 1101; *State Fund, supra,* 70 Cal.App.4th at p. 653.)  Implying a waiver from the Stephens entities' mere failure to object to the trustee's sale of the fee claim would contravene this rule.  Similarly, in subpoenaing the documents from the bankruptcy trustee, the Stephens entities did not disclose any privileged communication or otherwise manifest consent to the dissemination of their client file to a third party.  Indeed, there was clear evidence that the Stephens entities did not intend to waive any privilege by subpoenaing the trustee, to wit:  (1) the Stephens entities did not seek production of their client file in the subpoena because they had previously concluded that the trustee did not possess their client file in light of the trustee's failure to return it;  (2) the Stephens entities served the subpoenas before Danko

17

produced the client file; (3) upon learning of the unauthorized production of their client file, the Stephens entities immediately demanded that the trustee stop the production or, if it had already occurred, inform the deposition officer to destroy the production or return it unopened; and (4) upon learning that Danko possessed their client file, the Stephens entities obtained a temporary restraining order preventing Danko from reviewing the trustee's unauthorized production. On this record, there is no basis to find a waiver of the attorney-client privilege based on the Stephens entities' failure to object to the sale of the fee claim or their subpoena to the bankruptcy trustee.

### 4. Statutory Exception

As noted, Evidence Code section 958 creates an exception to the attorney-client privilege for communications "relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship." (Evid. Code, § 958.) Danko contends he is entitled to the Stephens entities' client file because he purchased the disputed attorney fee claim from the bankruptcy trustee. As the bankruptcy trustee's assignee of O'Reilly's fee claim, Danko asserts that he stands in O'Reilly's shoes and thus has the same right to the client file as the trustee and O'Reilly would have in defending O'Reilly in the declaratory relief action. For its part, the Stephens entities argue there is no authority equating a client's former attorney to a "litigation shopper" like Danko for purposes of the statutory exception set forth in Evidence Code section 958. The parties have presented no authority on this point, and there appears to be no applicable precedent on the issue.

In this case of apparent first impression, we find guidance in the nature and purpose of the challenged exception. Evidence Code section 958 is rooted in the equitable notion that it would be unjust to permit a client to accuse an attorney of a breach of duty and then to invoke the privilege to prevent the attorney from introducing evidence in defense of the claim. (*Anten v. Superior Court* (2015) 233 Cal.App.4th 1254, 1258 (*Anten*).) "For example, it would be 'fundamentally unfair for a client to sue a law firm for the advice obtained and then to seek to forbid the attorney who gave that advice from reciting verbatim, as nearly as memory permits, the words spoken by his accuser

18

during the consultation.' [Citation.] Similarly, a written fee contract between an attorney and a client is itself a privileged communication [citation], but it would be unfair to allow the client to invoke the privilege in order to exclude the contract in an action by the attorney for unpaid fees." (*Ibid*.)

"The wording of [Evidence Code] section 958 is broad, but case law has clarified that the exception is limited to communications between the lawyer charging or charged with a breach of duty, on the one hand, and the client charging or charged with a breach of duty, on the other." (*Anten, supra,* 233 Cal.App.4th at p. 1259.) The instant case involves the novel scenario in which a third party purchases a litigation claim and purports to stand in the shoes of the attorney in defending itself against the client's claim of breach of duty.

Setting aside for a moment the third-party purchase aspect, as between O'Reilly and Stephens, the disputed attorney fee claim falls squarely within the literal terms of Evidence Code section 958. Had Stephens sued O'Reilly, Stephens would have been unable to prevent the disclosure of documents relevant to issues of any alleged breach arising out of the lawyer-client relationship. Similarly, had O'Reilly cross-complained or raised affirmative defenses regarding the absence of a signed retainer agreement and/or any malpractice claim, under the plain language of Evidence Code section 958, the attorney-client privilege would not apply to those communications. Both by disputing the amount of attorney fees owed to O'Reilly and by claiming malpractice, Stephens put in issue the validity of the lawyer-client relationship itself. Under these circumstances, it would be fundamentally unfair for Stephens to invoke the privilege to prevent O'Reilly from defending himself.

The Stephens entities vigorously argue that Evidence Code section 958 does not extend to third parties but is limited to those within the lawyer-client relationship. Broadly speaking, this assertion is consistent with the plain language of the statue and policy considerations. For example, "a legal malpractice defendant cannot invoke the exception in order to permit discovery of communications between the plaintiff and the attorney who represents the plaintiff in the malpractice action. [Citation.] Likewise, a

19

legal malpractice plaintiff cannot invoke the exception in order to permit discovery of communications between the defendant attorney 'and other clients of his not privy to the relationship between' the defendant and the plaintiff." (*Anten, supra,* 233 Cal.App.4th at p. 1259.)

Strictly speaking, however, Danko is not a third party. Danko purchased the fee claim and assigned it to O&C Creditors, which effectively stands in the shoes of O'Reilly with respect to this claim.[6] To the extent the declaratory relief action and related cross-complaint involve issues of breach arising out of the lawyer-client relationship between O'Reilly and Stephens, those communications are not confidential as to Danko. However, Danko's entitlement to otherwise privileged communications between Stephens and O'Reilly is limited to communications that have been put at issue by the declaratory relief action and related cross-complaint. In other words, Danko is not entitled to know all that transpired in the attorney-client relationship between Stephens and O'Reilly. The trial court's carefully-crafted order ensures that only information related to communications that have been put at issue by the underlying litigation will be disclosed. The trial court did not abuse its discretion in granting the discovery order.

## C. *The Trial Court Did Not Err in Granting the Special Motion to Strike the Cross-Complaint*

The gist of O&C Creditors' cross-complaint is that Fireman's Fund and its attorneys at Akin Gump (cross-defendants) acted in derogation of a purported attorney lien by settling the underlying insurance coverage lawsuit and executing a settlement with Stephens. O&C Creditors contends that the trial court erred in granting the special motion to strike because its cross-claims against Fireman's Fund and Akin Gump did not fall within the ambit of the Code of Civil Procedure section 425.16. We disagree.

### 1. Applicable Law and Standard of Review

"A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the

---

[6] Although the Stephens entities argue at length about the evils of so-called "litigation shopping," these ethical issues are beyond the scope of the instant appeal.

government for redress of grievances. [Citation.] The Legislature enacted Code of Civil Procedure section 425.16—known as the anti–SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056.) The statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).) Subdivision (e) delineates the four types of acts that constitute a protected " 'act of that person in furtherance of the person's right of petition or free speech,' " including, as pertinent here, "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law . . . ." (Code Civ. Proc., § 425.16, subd. (e).) The Legislature has directed that the language of the statute should be "construed broadly." (Code Civ. Proc., § 425.16, subd. (a).)

A court's consideration of an anti–SLAPP motion involves a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. ([Code Civ. Proc.,]§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) In the second step, the plaintiff must only bring forward sufficient evidence to make out a viable prima facie case at trial, a burden that is "not particularly high." (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 602.)

21

As we review the trial court's decision to grant or deny an anti–SLAPP motion de novo, we conduct an independent review of the entire record. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1544.) In so doing, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (Code Civ. Proc., § 425.16, subd. (b)(2).) " 'However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' " (*Flatley*, at p. 326.)

## 2. Protected Activity

Fireman's Fund and Akin Gump contend that the cross-complaint falls within the anti-SLAPP statute because the settlement negotiations and written agreement were made in connection with an issue under consideration or review by a judicial body. (Code Civ. Proc., § 425.16, subd. (e)(2).) We agree.

Courts "have adopted a fairly expansive view of what constitutes litigation-related activities within the scope of [Code of Civil Procedure] section 425.16." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908.) A settlement agreement executed in the context of active litigation is "made in connection with an issue under consideration or review by a . . . judicial body." (Code Civ. Proc., § 425.16, subd. (e); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 85–86, 87 (*Navellier*) [finding defendant's negotiations and execution of release to be protected activity]; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 958, 963–967 (*Seltzer*) [reversing denial of anti-SLAPP motion in homeowner's action for fraud in connection with settlement negotiations in underlying lawsuit]; *GeneThera, Inc. v. Troy & Gould Professional Corp.* (2009) 171 Cal.App.4th 901, 908 [affirming grant of anti-SLAPP motion in lawsuit based on firm's communication of settlement offer]; *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1420 [attorney's negotiation of stipulated settlement in unlawful detainer action was protected conduct]; see also *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788–789 ["It is

22

undisputed that defendants met their first-step showing" that allegedly breached settlement agreement involved protected activity].)

O&C Creditors does not dispute that settlements are protected conduct under the anti-SLAPP statute. The ultimate question, then, is whether O&C Creditors' cross-claims "aris[e] from" the protected activity of the settlement of the Stephens-Fireman's Fund litigation. (Code Civ. Proc., § 425.16, subd. (b).) O&C Creditors argues that its claims fall outside the ambit of the anti-SLAPP statutes because there is no protection for the "wrongful disbursement" of settlement funds to Stephens. But as discussed below, the challenged cross-claims are founded upon and would not exist in absence of the protected settlement activity; the cross-claims thus " 'arise from' " and are " 'based on' " the settlement agreement, making them subject to the provisions of the anti-SLAPP statute. (*ValueRock TN Properties, LLC v. PK II Larwin Square SC LP* (2019) 36 Cal.App.5th 1037, 1047 (*ValueRock*), quoting *Bergstein v. Stroock & Stroock & Lavan* (2015) 236 Cal.App.4th 793, 804.)

To determine whether a claim meets the "arising from" requirement of the anti-SLAPP statute, we consider " 'the *principal thrust* or *gravamen* of a plaintiff's cause of action.' " (*ValueRock, supra,* 36 Cal.App.5th 1037 at p. 1047, quoting *Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510, 519–520.) The gravamen of O&C Creditors' claims is that cross-defendants wrongfully deprived O'Reilly of a 40 percent contingency fee in the underlying insurance coverage dispute. O&C Creditors argues the settlement agreement is merely incidental to its claims against cross-defendants. However, O&C Creditors' allegations regarding cross-defendants' allegedly wrongful conduct stem from cross-defendants' settlement of the Stephens-Fireman's Fund litigation (without acknowledging O'Reilly's claim to attorney fees), and their disbursement of the settlement proceeds pursuant to that agreement. For example, in its sixth cause of action, O&C Creditors alleges that Fireman's Fund breached a trust by "failing to advise the bankruptcy court of the *settlement*, and by secretly disbursing *said proceeds* in derogation of the [attorney] lien." "Said proceeds" obviously refers to proceeds of the Stephens-Fireman's Fund settlement, and the alleged attorney lien would

23

not even exist in absence of that settlement agreement. (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 293 [when the attorney's lien is tied to a contingency, attorney cannot enforce the lien until the contingency occurs]; *Kroff v. Larson* (1985) 167 Cal.App.3d 857, 860 [retainer agreement provided that attorney would be reimbursed for costs out of client's "recovery"; costs would thus be paid from client's recovery "by settlement or judgment," which "had to occur before the client was obligated" to the attorney].)

Likewise, in its cause of action for intentional interference with prospective economic advantage (IIPEA), O&C Creditors alleges the existence of a lienhold interest in "the *proceeds* from the Stephens cross-defendants' litigation against cross-defendant" Fireman's Fund. As other allegations of the cross-complaint make clear, those "proceeds from the Stephens cross-defendants' litigation" are unquestionably the $5.8 million "recovered" by Stephens via the "settlement reached between the Stephens cross-defendants and cross-defendant" Fireman's Fund. O&C Creditors' express allegations of a lienhold interest in the Stephens-Fireman's Fund settlement proceeds and of Fireman's Fund's and Akin Gump's purported conspiracy to "secretly pay and disburse the entirety of said [settlement] proceeds" necessarily demonstrate that the protected settlement activity "form[s] the basis" of and " 'suppl[ies] elements of the challenged' " cross-claim. (*Rand Resources v. City of Carson, LLC* (2019) 6 Cal.5th 610, 615, 621 (*Rand Resources*), quoting *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1064.) Put another way, Stephens's and Fireman's Fund's protected settlement activity—both their entry into an agreement that disclaims the existence of any attorney lien in favor of O'Reilly and the effectuation of that settlement agreement by paying only Stephens and Shapirsteyn in derogation of the alleged attorney lien—

24

underlie the elements of O&C Creditors' IIPEA claim.[7] The protected settlement activity thus lies "at the heart of" the claims asserted by O&C Creditors. (*Rand Resources*, at p. 616.) Accordingly, the trial court correctly concluded that O&C Creditors' claims arose from the negotiation and execution of the settlement agreement, which are protected activities under the anti-SLAPP statute. (*Navellier, supra*, 29 Cal.4th at p. 90; *Applied Business Software, Inc. v. Pacific Mortgage Exchange, Inc.* (2008) 164 Cal.App.4th 1108, 1118 [entering into a settlement agreement is a protected activity].)

Contrary to O&C Creditors' contention, cross-defendants' conduct in disbursing the settlement proceeds—i.e., carrying out the terms of the settlement agreement—cannot be neatly cleaved from the indisputably protected activity of negotiating and agreeing to the settlement itself. O&C Creditors and the dissent cite no authority holding that payment of settlement proceeds pursuant to a settlement agreement can be separated from the act of entering into the settlement agreement (without which the allegedly wrongful payment would not occur, and without which the attorney lien claim would not accrue), such that the disbursement falls outside the scope of the anti-SLAPP statutes.

The cases on which O&C Creditors primarily relies are distinguishable. The facts of *Old Republic Construction Program Group v The Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859 (*Old Republic*), are somewhat complicated, but its reasoning supports our analysis. In that case, Carabello was injured in a car accident while driving in the course of his employment. (*Id.* at p. 862.) Old Republic was his employer's workers' compensation insurer; it paid Carabello benefits greater than the policy limits of

_____

[7] "An IIPEA claim requires proof of (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." (*Port Medical Wellness Inc. v. Connecticut General Life Insurance Co.* (2018) 24 Cal.App.5th 153, 182–183.) Although O&C Creditors' cross-complaint is not a model of clarity, we believe the third and fourth elements of O&C Creditors' IIPEA claim depend on and are based on the settlement agreement, which expressly purports to eliminate O'Reilly's right to attorney's fees, in derogation of his alleged lien.

the driver who injured him (Casby). (*Id.* at pp. 862–863.) Old Republic filed a complaint in intervention in the Carabello-Casby action, asserting a right to reimbursement. (*Id.* at p. 863.) Carabello and Casby settled the personal injury case for Casby's $100,000 policy limits, without resolving Old Republic's claim to reimbursement. (*Ibid.*) Carabello's lawyer and counsel for Old Republic then signed a written stipulation providing that the $100,000 would be deposited into an interest-bearing account, with signatures of both counsel required for any withdrawal. (*Ibid.*)

Old Republic subsequently filed a notice of lien and a request to dismiss with prejudice its complaint in intervention. (*Old Republic*, *supra*, 230 Cal.App.4th at p. 863.) Carabello's lawyer contended that by dismissing the complaint, Old Republic had given up the right to obtain reimbursement. (*Id.* at p. 864.) Putting aside various procedural detours not relevant here, after giving notice to Old Republic's lawyer, Carabello's lawyer disbursed funds to Carabello. (*Ibid*.)

Old Republic then sued Carabello's lawyer and law firm, asserting various causes of action relating to the written stipulation. (*Old Republic*, *supra*, 230 Cal.App.4th at p. 865.) The trial court granted the law firm defendants' anti-SLAPP motion as to Old Republic's fraud claim, which was based on an assertion that defendants fraudulently induced Old Republic to consent to the stipulation, but denied it as to the remaining claims. (*Id.* at pp. 865–866.) In affirming, the *Old Republic* court first held that the written stipulation constituted protected conduct under Code of Civil Procedure section 425.16, subdivision (e)(2). (*Old Republic*, at p. 867, following *Navellier, supra,* 29 Cal.4th at p. 90 [a release of claims constitutes protected conduct under Code Civ. Proc., § 425.16, subd. (e)(2)].)

Turning to the question of whether the causes of action on appeal—breach of contract, negligence, and declaratory relief—"arose from the stipulation," the court noted that the claims "refer to, and may depend on, defendants' having entered into the stipulation, which was itself protected conduct." (*Old Republic*, *supra*, 230 Cal.App.4th at pp. 867, 869.) But in contrast to the fraud claim, which "arose from" the stipulation because the alleged wrongful conduct was "entry into the stipulation" itself, the

26

remaining claims were based on the withdrawal of funds in alleged breach of that agreement. (*Id.* at p. 869, italics omitted.) With that understanding of the gravamen of Old Republic's remaining causes of action, the court found that the stipulation was only "incidental" to the claims on appeal. (*Ibid.*) In so holding, the court reasoned: "If the protected status of an underlying agreement furnished sufficient ground to invoke the anti-SLAPP statute against a claim *for breach of that agreement*, it would follow that every suit to enforce a settlement agreement would be subject at the threshold to a SLAPP motion." (*Id.* at p. 870, italics added and omitted.)

In this case, by contrast, O&C Creditors is not a party to the settlement agreement seeking damages for its breach. To the extent *Old Republic* is relevant to the issues in this case, its analysis of the fraud claim demonstrates that the trial court here did not err. Like Old Republic's fraud claim, the factual underpinning of the cross-claims in this case is Fireman's Fund's purportedly wrongful "entry into" the settlement agreement (in derogation of O'Reilly's alleged right to fees), and the effectuation of the settlement by disbursing the settlement proceeds in accordance with that agreement. (*Old Republic, supra*, 230 Cal.App.4th at p. 869.) The settlement agreement is thus in no way merely "incidental" to the wrongful conduct that underlies the cross-claims; it forms the fundamental factual basis for the claims. Although the cross-complaint carefully avoids using the phrase "settlement agreement," we look past that artful drafting to review the gravamen of the cross-claims, which arise from and are "based on" Fireman's Fund's allegedly wrongful "negotiation and execution" of the settlement agreement. (*Navellier, supra,* 29 Cal.4th at pp. 89–90.) *Old Republic* is thus inapposite.

We are similarly unpersuaded by O&C Creditors' reliance on *Drell v. Cohen* (2014) 232 Cal.App.4th 24. There, attorney Cohen represented an injured party in a personal injury action on a contingency basis. (*Id.* at p. 26.) When Cohen withdrew from the representation, the injured party retained plaintiff Drell to take over the case. (*Ibid.*) Cohen "asserted an attorney fee lien, informing one of the insurers in the personal injury case that any payment of funds to [the injured party] was subject to a lien for their fees incurred during the representation." (*Id.* at pp. 26–27.) Drell negotiated the settlement of

27

the personal injury case, and the insurer made the check payable to both Drell and Cohen. (*Id.* at p. 27.) Drell filed a declaratory relief action against Cohen and his law firm to determine the status of the lien; the defendants filed an anti-SLAPP special motion to strike, contending that the declaratory relief action "arose from their protected activity of asserting a lien in a demand letter that threatened litigation." (*Ibid.*)

In rejecting Cohen's argument, the *Drell* court explained: "Defendants are correct that a demand letter may be protected, but a complaint is not a SLAPP suit unless the gravamen of the complaint is that defendants acted wrongfully by engaging in the protected activity. The complaint here did not allege defendants engaged in wrongdoing by asserting their lien. Rather, the complaint asked the court to declare the parties' respective rights to attorney fees. The complaint necessarily refers to defendants' lien, since their demand letter is key evidence of plaintiff's need to obtain a declaration of rights[], but the complaint does not seek to prevent defendants from exercising their right to assert their lien." (*Drell*, *supra*, 232 Cal.App.4th at p. 30, fn. omitted.) Here, however, the gravamen of the cross-claims is that Fireman's Fund engaged in wrongdoing by settling the Stephens-Fireman's Fund litigation "around" O'Reilly's attorney lien and disbursing proceeds pursuant to the settlement agreement and in contravention of that lien. *Drell,* therefore, does not compel reversal.

Far from providing mere evidentiary support for or being incidental to the challenged claims, the settlement agreement is the crux of cross-defendants' allegedly wrongful conduct. O&C Creditors cannot allege its claims without the settlement agreement—both because the allegedly wrongful "disbursement" of "proceeds" occurred only because of the settlement agreement and because the alleged attorney lien could not arise without the settlement. O&C Creditors' claims are thus based on and arise from a purportedly wrongful settlement agreement, which constitutes a statement and writing "made in connection with an issue under consideration or review by a . . . judicial body." (Code Civ. Proc., § 425.16, subds. (b), (e); see *Seltzer, supra,* 182 Cal.App.4th at pp. 962–964, 968–969 [plaintiff's claimed injury (non-payment of attorney fees) was a necessary consequence of allegedly wrongful settlement].)

28

The dissent's approach would allow O&C Creditors to do an end-run around established anti-SLAPP precedent such as *Navellier* and *Seltzer* by employing an artful pleading tactic that seeks to divorce the disbursement of settlement proceeds from the settlement agreement itself. But the protected settlement activity between Stephens and Fireman's Fund gave rise to both the allegedly wrongful disbursement and the allegedly derogated attorney lien "at the heart of" O&C Creditors' cross-claims. (*Rand Resources*, *supra*, 6 Cal.5th at p. 616.) Although the dissent refers repeatedly to the payment of "money" as the act that purportedly underlies O&C Creditors' cross-claims, it is noteworthy that that generic word appears nowhere in the cross-claims themselves. Rather, as noted above, although the allegations in the carefully-worded cross-claims do not include the term "settlement agreement," those claims are expressly founded upon the disbursement of "proceeds" from the protected settlement, a disbursement that was made *pursuant to* the settlement agreement, which was allegedly wrongful because it is in derogation of a lien claim that exists only *because of* the settlement agreement. (*Southern California Gas Co. v. Flannery* (2016) 5 Cal.App.5th 476, 494 [cause of action to enforce attorney lien in a contingency fee contract arises only on occurrence of stated contingency]; see also *Kroff v. Larson, supra*, 167 Cal.App.3d at p. 860 [retainer agreement specifying attorney reimbursement based on "recovery" required "settlement or judgment" before attorney had right to be reimbursed by client].)

Under the theory advanced by O&C Creditors and espoused by the dissent, a claim challenging a *settlement agreement* in derogation of an attorney lien could be subject to an anti-SLAPP motion, whereas a claim using words that focus on the *effectuation* of that same settlement agreement would not. We cannot countenance this attempt to plead around the above-cited authorities holding that negotiating and executing a settlement agreement is protected activity under Code of Civil Procedure section 425.16, subdivision (e)(2). To do so would eviscerate their import and would contravene the

29

Legislature's directive that the anti-SLAPP statute is to be construed broadly. (Code Civ. Proc., § 425.16, subd. (a).)[8]

Nor are we convinced by the dissent's citation to *Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388. In that case (which involved two separate state court actions, multiple federal forfeiture proceedings, a criminal case and asset freeze in Switzerland, and a trip to the Ninth Circuit after a federal civil trial), the court held that Optional Capital's conversion and fraudulent transfer claims against DAS Corporation did not fall within the scope of the anti-SLAPP statute. (*Optional Capital*, at pp. 1393–1395, 1400–1401.) The court distinguished *Seltzer* on the basis that the settlement agreement between DAS and other parties was merely the "device" by which DAS allegedly "looted" and converted Optional Capital's funds. (*Id.* at pp. 1400–1401.) Here, by contrast, the settlement agreement between Stephens and Fireman's Fund is not merely the vehicle by which those cross-defendants executed a wrongful scheme to deprive O'Reilly of his right to fees. Instead, the settlement agreement is "at the heart of" and forms the fundamental factual underpinning of O&C Creditors' cross-claims. (*Rand Resources, supra*, 6 Cal.5th at p. 616.) Notwithstanding O&C Creditors' wordsmithing,

---

[8] The dissent asserts that our decision "announces a new rule which could easily subject all attorney lien disputes to the anti-SLAPP law's 'procedure for weeding out, at an early stage, meritless claims arising from protected [speech and petitioning] activity.' " (Dis. opn. *post*, at pp. 1–2, quoting *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) This opinion makes no such broad pronouncement. Our holding rests on the rather unique set of facts in this case, where a settlement agreement, by its terms, expressly purports to eliminate the right of a settling party's prior attorney to recover fees. And it bears noting that the anti-SLAPP motion was granted here because of another (presumably) uncommon factual scenario—specifically, the lack of even minimal merit in O&C Creditors' cross-claims, which rested upon an alleged attorney lien that was ineffective because the Stephens entities were able to void the retainer agreement in light of O'Reilly's failure to comply with Business and Professions Code section 6147. (See Section C.3, *infra*.) Contrary to the dissent's concerns, "all attorney lien disputes" will be unlikely to fall within the factual scenario presented here and thus the ambit of the anti-SLAPP law. Moreover, filing a baseless anti-SLAPP motion in a case involving a meritorious attorney lien claim could subject a defendant to an attorney's fees award in favor of a plaintiff who defeats such a motion. (See Code Civ. Proc., § 425.16, subd. (c)(1).)

its cross-claims "rely on" and arise from the allegedly wrongful acts of settling the case without regard to O'Reilly's lien and thereafter effectuating that settlement by paying Stephens and Shapirsteyn in accordance with the protected agreement, allegedly in derogation of the attorney lien. (*Ibid.*)

We are similarly unpersuaded by O&C Creditors' additional attempts to place this protected settlement activity outside the ambit of the anti-SLAPP statute. O&C Creditors argues on appeal that the anti-SLAPP statute does not apply for two reasons not raised below: first, because the instant case arises from commercial speech under Code of Civil Procedure section 425.17, subdivision (c), and second, because its claims are asserted in a cross-complaint. O&C Creditors failed to assert these arguments below and we will not consider them here, as we are " 'loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider,' " particularly where there was an "extensive record" below and the trial court analyzed the various issues in considered rulings. (*Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013, quoting *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.)

Finally, O&C Creditors claims that applying the anti-SLAPP statute to the settlement agreement abrogates the rule that an insurer can be liable for disbursing funds in derogation of an attorney lien. (See *Siciliano v. Fireman's Fund Ins. Co.* (1976) 62 Cal.App.3d 745, 759.) By this argument, O&C Creditors conflates the first and second prongs in the anti-SLAPP analysis. (*Jarrow Formulas, Inc v. LaMarche* (2003) 31 Cal.4th 728, 738.) O&C Creditors' contention is premised on the notion that, for purposes of the first prong, the court should presume that cross-defendants actually committed the alleged torts and, as a result, are not protected by the right to petition. If this were the case, the second prong of the anti-SLAPP motion would be superfluous. (*Navellier, supra,* 29 Cal.4th at pp. 94–95.) "[A] court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary." (*Governor Gray Davis Comm. v. American Taxpayers Alliance* (2002)

31

102 Cal.App.4th 449, 458.) O&C Creditors' argument—that cross-defendants agreed to an improper settlement—goes to the merits and, thus, is " 'an issue which [it] must raise and support in the context of the discharge of [its] burden to provide a prima facie showing of the merits of [its] case.' " (*Navellier, supra,* 29 Cal.4th at pp. 94–95, italics omitted.)

Accordingly, we proceed to the second prong of the anti-SLAPP analysis.

**3.** *Probability of Prevailing on the Merits*

"To satisfy the second prong—the probability of prevailing—the plaintiff must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to support a favorable judgment if the evidence submitted by the plaintiff is accepted. The trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant. Although ' "the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." ' " (*Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 962–963.) The party defending against an anti-SLAPP motion need only show that the claim has "minimal merit" to survive an anti-SLAPP motion. (*Navellier, supra*, 29 Cal.4th at pp. 93–94.)

The parties to a retainer agreement can create a lien in favor of the attorney upon the proceeds of a client's prospective recovery. (*Saltarelli & Steponovich v. Douglas* (1995) 40 Cal.App.4th 1, 6.) The form and content of attorney fee agreements are regulated by statute. (See Bus. & Prof. Code, § 6146 et seq.) The Legislature enacted these statutes to protect clients and ensure that fee agreements are fair and understood by clients. (*Leighton v. Forster* (2017) 8 Cal.App.5th 467, 483.) A written fee agreement is required in contingent fee cases. (Bus. & Prof. Code, § 6147.) "An attorney . . . *shall*, at the time the contract is entered into, *provide a duplicate copy of the contract, signed by both the attorney and the client* . . . to the plaintiff . . . ." (Bus. & Prof. Code, § 6147, subd. (a), italics added.) "Failure to comply with any provision of this section renders the

agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." (*Id.*, subd. (b).)

It is undisputed that the Stephens entities elected to void the retainer agreement because it was not signed by O'Reilly.[9] Nevertheless, O&C Creditors insists that the retainer agreement is not void because: (1) the agreement substantially complied with Business and Professions Code section 6147; and (2) the Stephens entities unreasonably delayed in their attempt to void the retainer agreement. Neither contention is supported by the plain language of Business and Professions Code section 6147.

Business and Professions Code section 6147, subdivision (a), unambiguously states that contingent fee cases require a written agreement "signed by *both* the attorney and the client." (Italics added.) "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.' " (*BedRoc Ltd., LLC v. U.S.* (2004) 541 U.S. 176, 183–184.) We think the terms "signed by both" make clear that the Legislature did not intend that a single signature would suffice.

Nevertheless, O&C Creditors spends considerable time arguing that because the Stephens entities signed the agreement they were aware of its provisions and, as such, the legislative goal of protecting clients has been met. According to O&C Creditors, there is no unfairness "[i]f the client is fully aware of the agreement's provisions and understands them . . . ." O&C Creditors further posits that "there is simply no reason not to enforce the agreement. The client will have received everything for which it bargained." This argument is directly contrary to the plain language of the statute. As discussed, a contingency fee agreement must be "*signed by both the attorney and the client . . . .*"

---

[9] O&C Creditors argue that the actual argument is that O'Reilly failed to provide Stephens with a duplicate copy signed by both the attorney and client. For our purposes, this is a distinction without a difference. The gist of Stephens's claim is that O'Reilly never signed the retainer agreement. The record reflects that all of the copies of the retainer agreement lack a signature by O'Reilly. As the trial court noted, if anyone had a copy of the retainer agreement signed by O'Reilly, "it is highly likely that it would have surfaced by now."

(Bus. & Prof. Code, § 6147, subd. (a), italics added.)  Adopting O&C Creditors'
substantial compliance argument would render the dual signature requirement mere
surplusage.  This we may not do.  "[I]nterpretations which render any part of a statute
superfluous are to be avoided."  (*Wells v. One2One Learning Foundation* (2006)
39 Cal.4th 1164, 1207.)

Accepting O&C Creditors' substantial compliance argument would also nullify
the client's ability to void the agreement.  Such a result would contravene the express
statutory language making a non-conforming agreement "voidable at the option" of the
client.  (Bus. & Prof. Code, § 6147, subd. (b).)  Again, where, as here, the statutory
language is clear we presume that the Legislature meant what it said—i.e., in contingency
fee cases there must be a written agreement signed by *both* the attorney and the client.
And if the agreement fails to comply with these and other requirements not relevant here,
the client may elect to void the contract.  (Bus. & Prof. Code, § 6147, subds. (a)(1)–(5) &
(b).)  Had the Legislature intended for substantial compliance to be sufficient to satisfy
the statutory requirements it could and would have said so.  We will not "insert missing
terms into the statute or adopt an interpretation precluded by the plain [statutory]
language."  (*Yamada v. Snipes* (9th Cir. 2015) 786 F.3d 1182, 1188; see *People v.
Gonzalez* (2017) 2 Cal.5th 858, 871.)

Equally without merit is O&C Creditors' claim that Stephens did not attempt to
exercise its option under Business and Professions Code section 6147, subdivision (b)
until it was too late to do so and that its attempt to rescind the agreement was untimely
and thus ineffective.  O&C Creditors cites no authority for grafting rescission
requirements onto Business and Professions Code section 6147.  We decline to insert a
timeliness component into Business and Professions Code section 6147 where none
exists.

In sum, O&C Creditors failed to establish a probability of prevailing on the merits,
and the trial court did not err in granting the special motion to strike.

34

### D. *The Trial Court Did Not Err in Awarding Attorney Fees*

After its success on the anti-SLAPP motion, Fireman's Fund moved for attorney fees in the amount of $122,798.17 under Code of Civil Procedure section 425.16, subdivision (c)(1), which entitles the party prevailing on a special motion to strike to recover fees and costs. Finding that the attorneys' hourly rates and time spent on the anti-SLAPP motion were "excessive," the trial court reduced the fees to $55,884.17. O&C Creditors challenges the amount awarded.

An order granting attorney fees is generally reviewed for abuse of discretion, in particular with respect to the amount of fees awarded. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*).) The amount of an attorney fees award under the anti-SLAPP statute is computed by the trial court in accordance with the familiar "lodestar" method—multiplying the number of hours reasonably expended by the reasonable hourly rate prevailing in the community for similar work. (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 491.) The lodestar "may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).) An experienced trial judge is in the best position to evaluate these factors and to value professional services rendered in court. (*Ibid.*)

O&C Creditors attacks the attorney fees award here on four grounds: (1) the trial court erred in awarding Fireman's Fund the fees incurred by Akin Gump in representing itself; (2) the trial court used an incorrect hourly rate; (3) the court failed to apportion fees unrelated to the anti-SLAPP motion; and (4) the fee statements were vague and block-billed. None of these contentions warrants reversal.

#### 1. Apportionment of Fees

O&C Creditors contends that Fireman's Fund was not entitled to fees for the time spent by Akin Gump in representing itself in the anti-SLAPP motion. We disagree. The

fact that Akin Gump was also named in the SLAPP suit does not preclude Fireman's Fund from recovering its attorney fees.

In *Trope v. Katz* (1995) 11 Cal.4th 274, 292 (*Trope*), our Supreme Court held that a law firm suing in propia persona to recover unpaid fees could not recover fees for that litigation because it represented itself. In *Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482 (*Taheri*), the Court of Appeal denied fees to a defendant-attorney who successfully litigated an anti-SLAPP motion on his own behalf. The court reasoned: "Since *Trope,* the Supreme Court and other courts have made clear that *Trope* did not preclude the recovery of attorney fees in other circumstances where the litigant did not actually incur fees, such as for work performed by in-house counsel, pro bono work, and the like. But a necessary predicate for obtaining fees is *the existence of an attorney-client relationship.* (See *PLCM Group,* [*supra,*] 22 Cal.4th [at p.] 1092 ['by definition, the term "attorney fees" implies the existence of an attorney-client relationship, i.e., a party receiving professional services from a lawyer']; *Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510, 524 (*Ramona Unified*) ['[w]here an attorney-client relationship exists, the courts uniformly allow for the recovery of attorney fees under Civil Code section 1717'].)" (*Taheri*, at p. 494, italics added.)

"The same principle applies to attorney fees under the anti-SLAPP statute. (*Ramona Unified, supra,* 135 Cal.App.4th at p. 524 ['[c]ases that have allowed the recovery of attorney fees under the anti-SLAPP statute are similarly marked by the existence of an attorney-client relationship']; see also *Dowling v. Zimmerman*, *supra*, 85 Cal.App.4th at p. 1425.) In short, 'the commonly understood definition of attorney fees applies with equal force to [Civil Code of Procedure] section 425.16 and a prevailing defendant is entitled to recover attorney fees if represented by counsel.' (*Ramona Unified, supra,* 135 Cal.App.4th at p. 524.) Under *Trope* and its progeny, it necessarily follows that a party, whether or not he is an attorney, who is not represented by counsel and who litigates an anti-SLAPP motion on his own behalf may not recover attorney fees under the statute." (*Taheri, supra,* 160 Cal.App.4th at p. 494.)

36

Here, Akin Gump represented Fireman's Fund in the cross-action. The circumstances are akin to those in *Ramona Unified, supra,* 135 Cal.App.4th 510, in which the court upheld an attorney fee award to a defendant-attorney under the anti-SLAPP statute because she had an attorney-client relationship with her nonattorney codefendants. (*Id.* at pp. 523–524.) Observing that the Supreme Court had itself recognized the centrality of the existence of an attorney-client relationship to the attorney fee issue in *PLCM Group, supra,* 22 Cal.4th at page 1092, the appellate court in *Ramona Unified* rejected the same argument made here, that insofar as the award encompassed fees for the time spent by a named defendant-attorney assisting in litigating the anti-SLAPP motion, it was erroneous under *Trope*. (*Ramona Unified,* at pp. 523–524.) The Court of Appeal reasoned: "Where an attorney-client relationship exists, the courts uniformly allow for the recovery of attorney fees under Civil Code section 1717. (*PLCM, supra,* 22 Cal.4th at p. 1093 [party represented by in-house lawyers]; *Mix v. Tumanjan Development Corp.* (2002) 102 Cal.App.4th 1318, 1321 [successful pro per litigant can recover attorney fees under Civil Code section 1717 for legal services of assisting counsel even though they did not appear as attorneys of record]; *Gilbert v. Master Washer & Stamping Co.* (2001) 87 Cal.App.4th 212, 220 [attorney represented by other members of his or her own law firm entitled to recover contractual attorney fees].) [¶] Cases that have allowed the recovery of attorney fees under the anti-SLAPP statute are similarly marked by the existence of an attorney-client relationship." (*Ramona Unified,* at p. 524.)

Because an attorney-client relationship existed between Fireman's Fund and Akin Gump, *Trope* does not preclude the award of attorney fees merely because Akin Gump was a codefendant with the client to whom it provided legal assistance. (*Ramona Unified, supra,* 135 Cal.App.4th at pp. 524–525.)

## 2. Hourly Rate

O&C Creditors next argues that the trial court abused its discretion in adopting a $600 hourly rate for Robert Humphreys, an attorney with over 20 years of complex civil litigation experience, who handled the anti-SLAPP motion on his own. Humphreys provided a declaration establishing his expertise and experience, explaining that his $740

37

hourly rate was commensurate with other attorneys in this geographic area with comparable skills, education, and experience. O&C Creditors' assertion that any local attorney would charge no more than $425 an hour does not establish that the trial court abused its discretion by crediting Humphrey's declaration but reducing the rate by roughly 20 percent to reflect that some of the work could have been performed by more junior attorneys. (See *Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375 [declarations of counsel providing services can prove reasonableness of billing rates]; *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 255 ["An experienced trial judge is in a position to assess the value of the professional services rendered in his or her court."], disapproved on another ground in *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 274, fn. 4.)

### 3. Examination of Hours Billed

O&C Creditors also argues that the trial court erred in compensating Fireman's Fund for 32.5 hours of work[10] unrelated to the anti-SLAPP motion. We disagree.

Fireman's Fund initially sought fees covering 190.6 hours of work. The trial court awarded fees for 90 hours of work: 50 hours for the anti-SLAPP motion, 20 hours for the attorney fees motion, and 20 hours for the ex parte applications and discovery motion related to the anti-SLAPP motion. The court thus cut more than 100 hours from the fee request in an order that by its terms covers only the fees associated with the anti-SLAPP litigation. Where, as here, the trial court substantially reduces a fee or cost request, we infer the court has determined the request was inflated. (*Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 817.) An attorney fee dispute is not exempt from generally applicable appellate principles: "The judgment of the trial court is presumed correct; all intendments and presumptions are indulged to support the judgment; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive." (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561–562.) Moreover, the trial court

_____

[10] In opposing the motion for attorney fees, O&C Creditors submitted an expert declaration with an accompanying chart referencing each purported improper entry.

was not required to specify the hours it found to be compensable.  (*Ketchum, supra*, 24 Cal.4th at p. 1140 ["The superior court was not required to issue a statement of decision with regard to the fee award" after an anti–SLAPP win].)  O&C Creditors offers only speculation that the court improperly included in the substantially reduced fee award 32.5 hours O&C Creditors claims were non-compensable.  O&C Creditors' contention that the court should have further slashed the fee request by an additional 32.5 hours fails to demonstrate an abuse of discretion.

### 4.  Block-Billing

Finally, O&C Creditors contends that Akin Gump submitted "vague, block-billed" time sheets in which all the work for each day was lumped together with no indication of how much time was allegedly spent on each task.  In California, "detailed timesheets are not required" and "[t]he court may award fees based on time estimates for attorneys who do not keep time records."  (*Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 64.)  Trial courts retain discretion to penalize block billing when the practice prevents them from discerning which tasks are compensable and which are not.  (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1324–1325; *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689 [trial court may "exercise its discretion in assigning a reasonable percentage to the entries, or simply cast them aside"].)  The trial court identified no such problem here.  Nor do we discern any.

## III.    DISPOSITION

The order denying Stephens's motion to disqualify Danko Meredith from representing O&C Creditors is affirmed.  The order granting the anti-SLAPP motion in favor of Fireman's Fund and Akin Gump is affirmed.  The order granting attorney fees to Fireman's Fund is affirmed.  With respect to O&C Creditors' challenge to the discovery order, we deny writ relief.  Each party shall bear its own costs on appeal.

_____
BROWN, J.


I CONCUR:


_____
STREETER, ACTING P. J.


*O&C Creditors Group, LLC et al. v. Stephens & Stephens XII, LLC et al. (A151789); Stephens & Stephens XII, LLC et al. v. O&C Creditors Group, LLC et al. (A152002); O&C Creditors Group, LLC et al. v. Akin gump Straus Hauer & Feld, LLP* (A152762)

TUCHER, J., CONCURRING and DISSENTING

On only one of the many issues raised by these consolidated appeals do I disagree with the majority. I believe that the anti-SLAPP statute does not protect the activity of an insurer disbursing funds allegedly in derogation of an attorney lien, even if the insurer promised to do so in a settlement agreement.

The law governing enforcement of attorney liens is well established. An attorney lien is created "by an attorney fee contract with an express provision regarding the lien or by implication in a retainer agreement that provides the attorney will be paid for services rendered from the judgment itself." (*Mojtahedi v. Vargas* (2014) 228 Cal.App.4th 974, 977 (*Vargas*).) Only after the client has obtained a judgment may the attorney " ' "bring a separate, independent action against the client to establish the existence of the lien, to determine the amount of the lien, and to enforce it." ' " (*Id.* at pp. 977–978.) If a third party, such as an insurer, acts to impair an attorney's rights under such a lien, the attorney may have a cause of action against that third party for tortious interference with contractual relations or prospective economic advantage. (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 291; *Siciliano v. Fireman's Fund Ins. Co.* (1976) 62 Cal.App.3d 745, 752–753 (*Siciliano*).) In that context, "it is the act of payment in derogation of the lienholder's rights that creates [the third party's] liability." (*Levin v. Gulf Ins. Group* (1999) 69 Cal.App.4th 1282, 1287, italics omitted (*Levin*).)

Thus, as the present case illustrates, claims based on an attorney lien cannot be asserted until after litigation is resolved. After settling insurance coverage litigation, Stephens filed this declaratory relief action challenging the validity of O&C Creditors' attorney lien, and O&C Creditors responded with cross-claims asserting its rights as the alleged lien holder. Fireman's Fund and Akin Gump (cross-defendants) are named in causes of action to impose a constructive trust and to recover damages for intentional interference with prospective business advantage, on the pleaded theory that they knowingly disbursed settlement funds in derogation of an attorney lien. This sort of attorney lien litigation has nothing to do with free speech or petitioning activity. And yet the majority announces a new rule which could easily subject all attorney lien disputes to

1

the anti-SLAPP law's "procedure for weeding out, at an early stage, meritless claims arising from protected [speech and petitioning] activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384, italics omitted.)

Under the anti-SLAPP statute, "[a] cause of action against a person *arising from* any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike" unless the plaintiff shows the claim has merit. (Code of Civ. Proc., § 425.16, subd. (b)(1), italics added.) As pertinent here, an act in furtherance of a person's right of petition or free speech includes "any written or oral statement or writing" that is made "before a . . . judicial proceeding" or "in connection with an issue under consideration or review by a . . . judicial body." (*Id*., subd. (e).) Negotiating and executing a settlement agreement are, accordingly, protected activities. (*Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 963–964.)

However, to establish that O&C Creditors' claims arise from protected settlement activity, cross-defendants would have to demonstrate that each cause of action alleged against them in this case is *based on* their negotiation and/or settlement of the underlying insurance coverage litigation. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*).) "[A] claim does not 'arise from' protected activity simply because it was filed after, or because of, protected activity, or when protected activity merely provides evidentiary support or context for the claim. [Citation.] Rather, the protected activity must 'supply elements of the challenged claim.' " (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 (*Rand Resources*).) In other words, " 'the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063 (*Park*).)

These principles compel the conclusion that the claims against cross-defendants do not arise out of protected activity because the cross-defendants' act that gave rise to these causes of action was the disbursement of money in derogation of an attorney lien. Such conduct is not speech or petitioning activity in any sense. Cross-defendants' contention

2

that these claims arise out of their settlement agreement with Stephens is not sustainable because the cross-complaint does not explicitly or implicitly accuse cross-defendants of injuring O&C Creditors by settling the underlying insurance coverage action. To the contrary, the injury alleged was the disbursement of the entire fund of money paid to resolve the underlying case, without regard to attorney O'Reilly's claim to a portion of the proceeds. Whether the underlying case resolved by judgment or by settlement was immaterial for purposes of O&C Creditors' claims. Similarly immaterial was whether the settlement agreement did, or did not, specify to whom the funds would be delivered. The gravamen of O&C Creditors' claims was that cross-defendants paid others money that should have gone to them under the lien.

The majority follows cross-defendants in the mistaken view that these claims could not have arisen if not for the settlement agreement, and that this fact is dispositive. (Maj. opn. *ante*, at p. 23–25.) On both points, I disagree. A simple thought experiment proves the first error in the factual premise that these claims depend on there being a settlement agreement: If, instead of settling, Stephens had re-tried his insurance coverage action against Fireman's Fund and secured a money judgment, and then Fireman's Fund and Akin Gump had paid the amount of that judgment entirely to Stephens, O&C Creditors could allege essentially the same causes of action against these parties. The settlement is therefore incidental to O&C Creditors' claims, in that the obligation to pay on the attorney's lien could have been triggered instead by a contested judgment. As for the majority's legal conclusion, it mistakenly reduces the "arising from" element of the anti-SLAPP statute to mere but-for causation. That "[a] cause of action may be " 'triggered by' " or associated with a protected act . . . does not necessarily mean the cause of action arises from that act." (*Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537, italics omitted [garden variety legal malpractice action did not arise from protected activity]; accord *City of Cotati*, *supra*, 29 Cal.4th at p. 77.) Instead, the protected activity must itself be the injury-causing act upon which the cause of action is based. The injury-causing conduct in this case is the disbursement of settlement funds, not the protected act of settling a lawsuit.

3

As our Supreme Court explained in *Park*, regardless whether a claim was filed "*because of* protected activity," the claim does not arise out of protected activity for purposes of the anti-SLAPP law unless the specific elements of the plaintiff's cause of action depend upon the protected activity. (*Park, supra,* 2 Cal.5th at p. 1064.) Protected activities must "supply elements of the challenged claim." (*Ibid*.) That is simply not the case here, as demonstrated by the elements of C&O Creditors' claim for intentional interference with business advantage, which are: "(1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512.) The fact that cross-defendants negotiated a settlement with Stephens does not establish any of these elements. Instead, the allegedly intentional and wrongful act that disrupted O&C Creditors' relationship with Stephens was cross-defendants' payment of money that they knew was subject to an attorney lien.

On this point, *City of Cotati*, *supra,* 29 Cal.4th at pp. 77–79, is instructive. In that case, a city filed a declaratory relief action regarding the constitutionality of a rent-control ordinance for mobile-home parks. Defendants, who owned mobile-home parks, argued the city's complaint was a SLAPP because it arose out of a federal action that defendants previously filed to challenge the rent ordinance. Rejecting this claim, the *City of Cotati* court explained that although the city's complaint may have been triggered by the defendants' federal action, it did not arise out of that protected activity. The gravamen of the declaratory relief action was a controversy about the constitutionality of the rent ordinance, not a controversy about the filing of the prior federal action. Thus, while the prior lawsuit "informed" the city of the existence of an actual controversy about the validity of the ordinance, and although evidence of an actual controversy is fundamental to establishing a right to declaratory relief, the city's lawsuit did not arise out of the defendants' protected activity of filing that prior lawsuit. (*Id*. at p. 79.) The

4

same reasoning applies here. The settlement of the insurance coverage litigation may have triggered the present lawsuit, but the causes of action against these cross-defendants do not arise out of their act of settling the insurance case. Instead, the gravamen of the cross-claims is the allegedly wrongful disbursement of money that followed, in derogation of a lien.

The majority concludes that the conduct of disbursing settlement proceeds cannot be "neatly cleaved" from the protected activity of negotiating a settlement in the first place. (Maj. opn. *ante*, at p. 25.) However, that is precisely what the law requires. "Although litigation-related activities constitute protected activity, 'it does not follow that any claims associated with those activities are subject to the anti-SLAPP statute. To qualify for anti-SLAPP protection, the moving party must [also] demonstrate the claim "arises from" those activities.' " (*ValueRock TN Properties, LLC v. PK II Larwin Square SC LP* (2019) 36 Cal.App.5th 1037, 1046, italics omitted.) Specifically, a defendant must "demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e)" of Code of Civil Procedure section 425.16. (*Park*, *supra*, 2 Cal.5th at p. 1063.) Here, the activity by cross-defendants that allegedly injured O&C Creditors was the failure to honor its attorney lien; the cross-complaint does not seek to impose liability on anybody for settling the insurance coverage litigation, nor for agreeing to certain terms in that settlement. The only act that gave rise to these cross-claims was the payment of money to Stephens to the exclusion of his original attorney. The majority's contrary conclusion is inconsistent with pertinent authority involving liens secured by money judgments.[1]

---

[1] The majority's conclusion also rests on an exaggerated reading of the settlement agreement as "expressly purport[ing] to eliminate O'Reilly's right to attorney's fees, in derogation of his alleged lien." (Maj. opn. *ante*, at p. 25, fn. 7.) The settlement agreement cannot and does not eliminate that right. Instead, the agreement contains a representation and warranty by Stephens that no other person or entity has a right to be named as a payee on the settlement check, and an indemnification provision in favor of Fireman's Fund if anybody, including O'Reilly, should claim otherwise. These provisions contemplate that there may be future proceedings to resolve collateral disputes over who is entitled to the settlement funds, and they allocate associated risks to

Take, for example, *California Back Specialists Medical Group v. Rand* (2008) 160 Cal.App.4th 1032. In that case, a group of medical service providers sued an attorney for violating medical liens that plaintiffs had obtained against the defendant's personal injury clients. Plaintiffs alleged defendant was liable for failing to notify them that he settled the underlying personal injury litigation and for disbursing the settlement proceeds without withholding funds to pay off the liens. The defendant responded with an anti-SLAPP motion to strike the complaint, which was denied. Affirming the ruling on appeal, the *California Back Specialists* court reasoned that the lien holders' action arose out of a controversy about the validity and satisfaction of the liens, which was not protected activity because it was a controversy between private parties that was never under consideration in any court or judicial proceeding before the challenged action was filed. The anti-SLAPP law did not apply simply because the attorney's conduct with respect to the liens was part of his representation of his personal injury clients in the underlying action. (*Id*. at p. 1038.)

So, too, here. O&C Creditors' claims do not arise out of protected activity because they are based on the cross-defendants' alleged failure to honor the attorney lien. This is a controversy among private parties involving an issue that was not under consideration in any judicial proceeding until Stephens filed the present action for declaratory relief. It is insufficient to assert, as this anti-SLAPP motion does, that the challenged conduct was " ' "in connection with" an official proceeding.' [Citation.] Instead, '[t]here must be a connection with an issue under review in that proceeding.' " (*Rand Resources, supra*, 6 Cal.5th at p. 620.) This controversy arose after cross-defendants settled the underlying action and as a result of their having done so, but these facts do not change the nature of the current dispute (i.e., the failure to honor an attorney lien), which was not an issue under review in the underlying litigation.

---

Stephens. This reading of the settlement agreement confirms that the attorney lien dispute in the case before this court is ancillary to, rather than arising out of, any protected petitioning activity in the prior insurance litigation.

To similar effect is *Drell v. Cohen* (2014) 232 Cal.App.4th 24 (*Drell*), a post-litigation dispute over an attorney lien. After settling a personal injury action on behalf of his client, an attorney named Drell received a settlement check made out jointly to him and to his client's former attorney, Cohen, who had filed a notice of his attorney lien in the personal injury case. When Drell filed a declaratory relief action to determine the status of Cohen's attorney lien, Cohen responded with a special motion to strike, claiming the assertion of his lien in the underlying action was protected litigation activity. The SLAPP motion was properly denied, the *Drell* court said, because the gravamen of Drell's cause of action was not that Cohen acted wrongfully by filing his lien. The gravamen of Drell's claim was the dispute about whether Cohen was entitled to attorney's fees. The fact that Cohen had asserted his right to an attorney lien during the underlying litigation was evidence of an actual controversy about fees, but the fee dispute itself did not arise out of that protected activity. (*Id.* at p. 30.)

Like *Drell,* this case involves a dispute about the validity of an attorney lien, specifically about an attorney's claim to fees after a case settles. The fact that in this case the parties to the settlement agreement specified a distribution of funds inconsistent with that lien does not alter the fundamental nature of this dispute. *Drell* teaches that the provision in the settlement agreement that requires proceeds to go to Stephens and Shapirshteyn (but not O'Reilly) is incidental to the anti-SLAPP analysis, just as Cohen's protected activity in filing an attorney lien was incidental to his assertion of a right to fees. In each case, the protected activity was evidence of a dispute ripe for judicial determination but was not itself the gravamen of the dispute.

The majority makes much of the fact that settlement in this case triggered O'Reilly's right to attorney's fees, in that he could not have asserted his lien before there was a settlement. (Maj. opn. *ante*, at pp. 28–29.) But the same could be said of Cohen in *Drell*, and indeed of any attorney seeking to enforce a lien on settlement proceeds. An attorney lien claim is necessarily triggered by settlement of, or judgment in, the underlying litigation, but that fact does not convert the fee dispute into a SLAPP suit. As our Supreme Court admonishes, "[t]hat a cause of action arguably may have been

7

triggered by protected activity does not entail that it is one arising from such," for purposes of the anti-SLAPP statute. (*City of Cotati*, *supra,* 29 Cal.4th at p. 78.) In an attorney's lien claim, the allegedly wrongful conduct is the settling parties' failure to honor the lien, which is neither speech nor petitioning activity. The payment of settlement proceeds in derogation of an attorney lien does not fit within the statutory language requiring a statement "in connection with an issue under consideration or review by a . . . judicial body" (Code Civ. Proc., § 425.16, subd. (e)), both because such conduct is not a statement of any kind, and because an attorney's entitlement to fees is not an issue before the court in the underlying litigation. (*Vargas*, *supra*, 228 Cal.App.4th at pp. 977–978.) Indeed, the trial court in the earlier action does not have jurisdiction to determine the rights of such a lien holder. (*Brown v. Superior Court* (2004) 116 Cal.App.4th 320, 328.)

The majority attempts to narrow the reach of its holding by distinguishing the settlement agreement in this case from ostensibly normal agreements that do not spell out who is to receive the settlement proceeds. (Maj. opn. *ante*, at p. 30, fn. 8.) I question the empirical assumption, but more fundamentally challenge the notion that parties who would violate an attorney lien may secure the protections of the anti-SLAPP law simply by describing their allocation of funds in the settlement agreement. The purposes of the anti-SLAPP statute "would [not] be served by elevating [this sort of] fee dispute to the constitutional arena." (*Drell, supra*, 232 Cal.App.4th at p. 30; see also *Siciliano, supra*, 62 Cal.App.3d at p. 758 ["Even though the law favors voluntary settlements or compromises, it does not favor the making thereof in derogation of the rights of those having a lien on the moneys or to whom other obligations are owing in connection therewith"].)

The majority's flawed approach leads them to misconstrue *Old Republic Construction Program Group v. The Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859 (*Old Republic*). In that case, a workers' compensation insurer sued attorneys for an injured employee, alleging they had wrongfully distributed to the injured man settlement funds they were supposed to hold in their trust account. Plaintiff Old Republic alleged

8

that the distribution violated a stipulation, executed during the underlying personal injury action, that defendants would not disburse settlement funds without first resolving Old Republic's claim for reimbursement of workers' compensation benefits paid to the injured employee. The trial court granted a special motion to strike Old Republic's cause of action for fraud, but it concluded that other claims against defendants for breach of contract, negligence and declaratory relief did not arise out of protected activity. Affirming the order on appeal, the *Old Republic* court found that the fraud claim arose from the protected act of executing a stipulation in the prior case: "The underlying wrongful conduct was defendants' alleged entry into the stipulation without the intention to be bound by it, thereby inducing Old Republic to do likewise and depriving it of control over the settlement funds." (*Id*. at p. 869, italics omitted.) By contrast, the other causes of action—for breach of contract, negligence and declaratory relief—"did not arise from the parties' stipulation" because "[i]t was the withdrawal of funds that was the wrongful conduct constituting the gravamen of these causes of action." (*Id*. at p. 870.)

The majority contends that *Old Republic* supports its analysis because O&C Creditors' claims against cross-defendants are analogous to the *Old Republic* fraud claim. I disagree. The allegedly fraudulent conduct in *Old Republic* was the act of entering into the stipulation. But here, O&C Creditors does not claim that cross-defendants' entry into a settlement with Stephens caused its injury; it contends that cross-defendants injured it by thereafter disbursing settlement funds they knew were subject to its attorney lien. In other words, these cross-defendants are charged with violating a duty alleged to derive from their notice of the attorney lien, an obligation that is independent of the settlement agreement they executed with Stephens.

Instead, this case is analogous to the non-fraud causes of action analyzed in *Old Republic*. Like those causes of action, O&C Creditors' claims "refer to, and may depend on, [cross-]defendants' having entered into" an agreement, which "was itself protected conduct." (*Old Republic, supra,* 230 Cal.App.4th at p. 869.) But O&C Creditors' claims do not, as the non-fraud claims in *Old Republic* did not, allege that there was anything wrongful about entering into the agreement itself. Instead, the gravamen of the non-fraud

9

claims in *Old Republic* was the "withdrawal of the funds that were the subject matter of the stipulation" (*ibid.*), just as in this case it is the wrongful payment of settlement funds. The payment was allegedly wrongful not because it was the subject of a settlement but because it was made with notice of the lien and in derogation of the lienholder's rights. (*Levin, supra,* 69 Cal.App.4th at pp. 1286–1287.)

The gravamen of these causes of action is the wrongful distribution of money, and the settlement agreement was merely the vehicle that created the funds to which the attorney lien attached. (See, e.g., *Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388, 1398–1401 [the arising from protected activity requirement is not satisfied when only connection between settlement and plaintiff's claims was that settlement was device defendant used to secure the allegedly wrongful release of funds].) In reaching a contrary conclusion, my colleagues fail to "respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Park, supra*, 2 Cal.5th at p. 1064.) The settlement that cross-defendants negotiated with Stephens led to and provided evidentiary support for O&C Creditors' claims, but these causes of action do not arise from that settlement agreement.

Because I conclude cross-defendants failed to make a threshold showing that the cross-claims arise from activity the anti-SLAPP law protects, I express no view on the merits of these cross-claims.

I CONCUR in the majority's opinion except to the extent it affirms the orders granting Fireman's Fund and Akin Gump's anti-SLAPP motion and awarding them attorney's fees, as to which I respectfully DISSENT.


_____
                                                    TUCHER, J.


10

Trial Court:     City & County of San Francisco Superior Court

Trial Judge:     Hon. Harold J. Kahn

Counsel:

Danko Meredith, Michael S. Danko, Claire Y. Choo; Law Office of Gary Sims, Gary L. Simms for Cross-complainants and Appellants in No. A151789.

Lubin Olson & Niewiadomski, Jonathan E. Sommer, Kyle A. Withers for Cross-defendants and Respondents Stephens & Stephens XII, LLC, et al. in No. A151789.

Akin Gump Strauss Hauer & Feld, LLP, Robert B. Humphreys, Rex S. Heinke for Cross-defendants and Respondents Fireman's Fund et al. in No. A151789.

Lubin Olson & Niewiadomski, Jonathan E. Sommer, Kyle A. Withers for Plaintiffs, Cross-defendants and Appellants in No. A152002.

Danko Meredith, Michael S. Danko, Claire Y. Choo; Law Office of Gary Sims, Gary L. Simms for Defendants, Cross-complainants and Respondents in No. A152002.

Danko Meredith, Michael S. Danko, Claire Y. Choo; Law Office of Gary Sims, Gary L. Simms for Cross-complainants and Appellants in No. A152762.

Akin Gump Strauss Hauer & Feld, LLP, Robert B. Humphreys, Rex S. Heinke for Cross-defendants and Respondents in No. A152762.